EQUITABLE LIFE ASSUR. SOCIETY OF UNITED STATES v. ELLIS.

(Supreme Court of Texas.   Jan. 8, 1913.)

1. INSURANCE (§ 654½*) — FORFEITURE — WAIVER—EVIDENCE.

On an issue of forfeiture of a policy for nonpayment of premium due March 24, 1906, correspondence between the insured and the company's agents with reference to extensions of time for the payment of the 1905 premium was admissible as tending to show the insurer's attitude toward the risk as revealed by its action in respect to the payment of that premium.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 1674, 1686; Dec. Dig. § 654½.*]

2. INSURANCE (§ 375*)—LIFE POLICY—FORFEITURE — PREMIUM—FAILURE TO PAY — WAIVER.

An agent of an insurance company in charge of its loan and extension department at its headquarters in New York would be deemed to have general authority to waive forfeiture on behalf of the company for nonpayment of premiums.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 948–951, 956–965; Dec. Dig. § 375.*]

3. INSURANCE (§ 392*)—LIFE POLICY—FORFEITURE—NONPAYMENT OF PREMIUMS.

After the expiration of the days of grace provided by a life policy, and the premium not having been paid, the insurer offered to make a loan on the insured's policies of $1,059 to be used in paying the current premiums and interest, provided that the insured would remit $356.50 to complete the loan transaction, no suggestion being made that proof of insured's good health should also be submitted in order to reinstate the policies before the transaction could be completed, and these negotiations were continued, and were in progress at the time insured was shot and killed. *Held*, that the insurer, by offering to make a loan, treated the policies as still in force, and such offer constituted a waiver of the forfeiture for nonpayment of the premiums.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 1041–1070; Dec. Dig. § 392.*]

4. INSURANCE (§ 388*)—NONPAYMENT OF PREMIUMS—FORFEITURE—WAIVER.

Waiver of a forfeiture of a life policy for nonpayment of premiums may result from any unequivocal acts by which the insurer, after knowledge of the forfeiture, recognizes the continued validity of the policy, or does some act based thereon, without insured having acted on the faith thereof.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 1026–1040, 1057; Dec. Dig. § 388.*]

On rehearing.  Overruled.

For former opinion, see 147 S. W. 1152.

PHILLIPS, J.   The correctness of the opinion in its statement of the record has been challenged by the motion and written argument on rehearing in two particulars. It is said that the record does not disclose that any special concession was made by the company to Ellis in respect to the 1905 premium, and that the statement in the opinion, in effect, that the company's action, through its cashier, Bourke, in relation to that premium evinced, as we viewed it, a purpose to maintain the insurance in force even at some breach of its rules and some sacrifice of its general policy, was unwarranted, because, after he had defaulted in the payment of that premium, Ellis was required to reinstate the policy as provided by its terms; that is, by furnishing a certificate of good health. It is true that finally in November of 1905, after Ellis had failed to pay the premium upon August 22d, the date of its extended maturity, the reinstatement of the policy was thus effected and the maturity of the premium extended to December 22d, but the following features of the record justify all that was said in the opinion in respect to this matter:

(1) After the original extension of the premium from March 24th to August 22d and Ellis' default in its payment on that date, a further extension was granted to December 22d, notwithstanding Bourke declared in his letter of August 21st that an extension for 60 days from August 22d was "longer than the society usually grants."

(2) Although the premium was due on August 22d and the policy was subject to forfeiture if it was not paid on that date, Bourke, according to this same letter, extended it "to give time to receive the remittance" which he was urging Ellis to make.

(3) While Bourke was insisting that it was necessary for the remittance to be in his hands before he could take up with the home office the matter of the further extension that Ellis had requested, when Ellis in his letter of August 31st threatened to take out his insurance in another company, Bourke, according to his letter of September 5th, referred the matter to the home office without having received any remittance.

(4) Bourke's declaration in his letter of September 22d that the company had informed him of its willingness "to make a special concession in this case," although "contrary to its rules."  Conceding that this related to a reinstatement of the policy based upon a showing of good health, it is plain from this statement that under the existing circumstances the company regarded a reinstatement of the policy even on that condition as a special concession and as contrary to its rules.

(5) Although under the extension granted to that date the premium was due on December 22d, and the policy was subject to forfeiture if not then paid, Bourke received and applied without question Ellis' remittance for the premium that could not have reached the San Antonio office before December 23d.

Further, it is said that we should correct the statement in the opinion that Wyman's letter to Ellis of May 9th was written pursuant to Brophy's letter to Wyman of April 25th, in which connection it is urged that Ellis was advised on May 1st of Brophy's reply of April 25th to Wyman's letter. This is a strained criticism of the opinion, for

it is not there said that Ellis was not advised until May 9th of Brophy's reply to Wyman's letter. On the contrary, the opinion states fully the contents of the May 1st letter from Wyman to Ellis. Wyman's letter to Ellis of May 9th was correctly referred to as having been written pursuant to Brophy's letter, for it expressed an offer of the company to make a loan on the policies exactly as Brophy had therein authorized.

We have carefully reviewed the several assignments of error in the light of all that has been said in the motion and written argument, and remain of the opinion that the case should be decided as it was upon the original hearing. We confined the discussion in the opinion principally to the question of waiver because we regarded it as the real question in the case, and considered that none of the assignments relating to the charge of the court and the admission of testimony was well taken. The charge of the court was more favorable to the insurance company than the law demanded, as it required the jury to find more than was necessary to entitle the plaintiff to a verdict.

[1, 2] The correspondence relative to the 1905 premium was admissible as tending to show the company's attitude toward the risk as revealed by its action in respect to the payment of that premium. In this sense, it was probative upon the question of the company's purpose and intent in its negotiation with Ellis respecting the payment of the 1906 premium, and it was therefore proper for the jury to consider it in determining whether such negotiation amounted to a waiver of the forfeiture. The question of Wyman's authority to make Ellis the proposal of a loan upon the policies that was made in the letter of May 9th is disposed of by Brophy's having authorized such an offer in his letter to Wyman of April 25th. And that the company was bound by Brophy's act does not admit of question. He was a general official of the company, in charge of its loan and extension department at its headquarters in New York. To him loans and extensions were referred. He had undoubted general authority in all such matters. His authorization to Wyman of the proposal that Wyman made to Ellis was clearly within the scope of his powers; and his act may, therefore, be regarded as the act of the company itself.

[3] It is not necessary to a re-examination of the position of the plaintiff in error on the question of waiver as elaborated in the motion and argument for rehearing to here restate in full what occurred between its agents and Ellis in regard to the premium for the year 1906. It matured on March 24th. It was not paid on that date, nor within the 30 days of grace provided by the policy. While the policy was subject to reinstatement thereafter upon payment of the premium with interest and upon proof of good health satis-

factory to the company, no effort was made by Ellis to thus reinstate it, nor in all the negotiation that transpired in respect to the matter was there any suggestion by the company of any necessity for such reinstatement. The negotiation between Ellis and the company in regard to the 1906 premiums on both policies began on February 16th, and ended with Wyman's letter of May 9th. Ellis was shot on May 11th, and died the following day. The last word in the negotiation was the concluding sentence in Wyman's letter of May 9th: "The society is willing to lend you $1159.00 on the policies to apply toward the payment of the premiums due a short time ago." In previous letters Wyman had stated that the loan value of the policies was $1,150 if the premiums for three years—that is including those for 1906 were paid—and had insisted that Ellis should remit $356.50 to complete the loan transaction that was pending, which amount, together with the loan value of the policies, would cover the premiums for the full year, $1,449, and interest for one year. Throughout the negotiation Ellis was insisting that he did not wish to borrow an amount necessary to cover the premiums for a full year, but that he desired the maturity of the premiums set up for nine months, or from March to December, and his letters indicate that he considered that this might be done without the payment of any amount in cash, inasmuch as the amount he wanted to borrow on the policies as security was only the amount of the premiums for nine months, which was less than the stated loan value of the policies. He had declined to consummate the transaction as Wyman had proposed, which evidently furnished the occasion of Wyman's referring the matter to Brophy at the home office in his letter of April 19th, which we erroneously stated in the opinion was not in the record. That letter submitted Ellis' proposal, as previously made to Wyman, as apparently the only way by which Ellis could continue with the company as a policy holder, and stated that Mr. Baker, the general manager, was very anxious to have the policies kept in force as they were large policies and Ellis was a well known man. Brophy replied in his letter of April 25th, which is copied in the opinion. However considered, Brophy's letter and Wyman's letters of May 1st and May 9th establish beyond doubt: (1) A willingness on the part of the company to loan Ellis $1,150 upon the security of the policies upon his payment of $356.50, at a time when, according to its present contention, the policies stood forfeited and dead because of Ellis' default in the payment of the premiums at maturity and the expiration of the period of grace provided by the policies. (2) An authorized communication to Ellis at such a time and under such conditions, following a negotiation for a satisfactory adjustment of the premiums that had extended over a period of nearly two months, of an unconditional offer by the

company to make him such a loan, with the policies as security, upon such terms. (3) Such offer so made at such time in the face of his previous refusal to complete the loan transaction upon these terms, and notwithstanding Wyman must have known that by his not having made the remittance of $61 to cover the term rate for 30 days from April 24th, the date of the expiration of the period of grace, as requested in Wyman's letter of April 19th, he had failed to do that which Wyman had urged as necessary to maintain the policies in force after the expiration of the days of grace for a period within which this offer was made. Under Brophy's proposal as embodied in his letter of April 25th, it will be observed that Ellis' payment of the premiums for 1906 was not required to close the transaction. It was only required that he pay the difference between the amount of the premiums and the loan value of the policies, with interest for one year, or the sum of $356.50. The policies themselves, through their value as security, were recognized as capable of providing the remaining $1,150 necessary to complete the payment of the premiums for the year.

The province of this court did not extend to a trial of the question of waiver on its merits. Applying what we regarded a settled principle of law, that in a case of this character a waiver of a forfeiture may result from negotiations or transactions with the insured, after knowledge of the forfeiture, by which the insurer recognizes the continued validity of the policy or does acts based thereon, our holding was that this record warranted the submission of the issue to the jury, and was sufficient to support its finding. It is now urged that Brophy's letter to Wyman expressed nothing more than a willingness of the company to accept the premium, and Wyman's letters of May 1st and May 9th amounted at most only to a demand for the premium, and it is sought to analogize the case with those holding that a mere demand for an overdue premium, not accompanied by its payment, does not operate to waive a forfeiture resulting from default in the payment. But these letters are not subject to this characterization. Wyman's letter to Brophy, as it plainly discloses, was for the purpose of ascertaining whether the company would consent to loan Ellis on the policies an amount equal to the premiums for nine months without requiring a cash payment, in accordance with Ellis' proposal. It stated, in effect, that only by such adjustment could Ellis be continued as a policy holder, and admits of the construction that Mr. Baker, the general manager, desired that Ellis' request be acceded to. While the purpose of the entire negotiation was to provide means to pay the premiums either for nine or twelve months, the subject of Wyman's letter was not immediately the premiums themselves or their payment, but the basis upon which the loan might be arranged.

The subject-matter of Brophy's reply was likewise the basis or condition on which the company was willing to make the loan. It did not deal with the premiums at all except as related to the loan and the provision the loan would afford for their payment.

The same may be said of Wyman's letter of May 9th. That letter does not bear the semblance of a demand for the premiums. It was but a restatement of the terms upon which the loan would be granted, and closed with an offer from the company to make a loan of a given amount upon the policies as security.

Great stress is laid upon the fact that the constant announcement of the company to Ellis was that at all events the payment by him of $356.50 was necessary; and it is argued at length that, as he failed to make such payment, no waiver could possibly result. But this proposition confuses what was necessary to complete the loan with what is required to complete a waiver. Undoubtedly the payment of that amount was required by the company according to these letters before it would make the loan; but is it true that the completion of the loan transaction was essential before a waiver of the forfeiture could result? The company was under no compulsion not to recognize and treat the policies as valid unless this amount were paid. It may have intended all the while, as it evidently did, to require this payment before consummating the loan, but in the negotiation it may still have regarded the policies as valid and capable of affording security for it. The question is, Did its offer to make the loan with the policies as security, even on condition of this payment, afford evidence that it recognized the policies as still unforfeited? Or, to narrow the question somewhat, it may be stated: Was this payment a condition of its recognition of the continued validity of the policies, or merely a condition of its willingness to make the loan? No letter in the correspondence indicates that it regarded the policies as forfeited. No mention is made any time after March 24th that such was their status. They continued down to May 9th to be the basis of the negotiation of the loan. If they were forfeited and dead, and so recognized by the company, is it reasonable to suppose that on April 25th, after the expiration of the period of grace, Brophy would have proposed that, if Ellis would pay $356.50, the company would advance upon them $1,150 wherewith to pay the premiums, or that on May 9th Wyman would have written, "the society is willing to lend you $1159.00 on the policies to apply toward the payment of the premiums due a short time ago"? In the estimate of the company they were then either forfeited or in force. They had no middle status. As the company itself regarded them up to the time of Ellis' death so the law ought to regard them, and as these letters furnish evidence that down

to May 9th the company recognized them as existing policies and so dealt with them in the negotiation with Ellis respecting the loan, it was but proper that the jury should determine the issue.

The whole argument of the plaintiff in error falls under the weight of its contention that what was meant in these proposals was that Ellis should first reinstate the policies by furnishing proof of good health satisfactory to the company, and only in such event were the policies to be accepted as security. Such reinstatement, accompanied by a payment of the premiums with interest, was a method of restoration provided by the policies themselves. The company certainly did not intend to base a loan upon policies that no longer possessed life or virtue. It therefore must have intended that they should be restored by this method of reinstatement, or, else in proposing to make the loan upon them as security, it must have regarded them as still in force. There is no escape from one or the other of these conclusions. If it did not intend that they should first be reinstated, it must have recognized their continued validity; otherwise, it stood in the position of proposing to make the loan upon policies that were forfeited and dead. As neither Brophy's nor Wyman's letter imposed their reinstatement as a condition of the loan, and contained no suggestion, even, that their reinstatement was necessary, it follows inevitably, at all events, that the jury was at liberty to regard the terms in which the offer of the loan was made as a recognition by the company that the policies were still in force, and to treat its act as an election to waive the forfeiture.

Our holding upon the original hearing was and still is that it was possible for the company to waive the forfeiture of these policies without the payment by Ellis of a consideration, and irrespective of a technical estoppel. The right of forfeiture was exclusively for the benefit of the company. It was at liberty to dispense with it without being paid to do so. If it elected to forego the right of forfeiture and maintain the policies in force, in the language of the law it became estopped to assert the forfeiture as a defense, but, in order for it to waive the advantage that it possessed in virtue of the right to forfeit, it was not absolutely essential that Ellis be misled. If it desired and intended to relinquish its right of forfeiture, it ought not to be held that its power to do so was entirely dependent upon a showing that Ellis was in some way deceived.

[4] The sounder rule is that in such a case a waiver of a forfeiture may result from unequivocal acts by which, after knowledge of the forfeiture, the insurer recognizes the continued validity of the policy, or does some act based thereon. Upon this subject in 25 Cyc. of Law and Procedure, 858, it is said: "While it is sometimes said as to waiver as

well as estoppel that there must be reliance by the insured on any waiver of forfeiture or other cause of invalidity, the weight of authority is in accord with the rule that any conduct on the part of the company inconsistent with its reliance on a breach will be a waiver of the breach, irrespective of any consideration or technical estoppel." In Hollis v. Insurance Co., 65 Iowa, 458, 21 N. W. 776, a leading authority on the same question, it is said: "The general doctrine of the instructions is that if defendant, with full knowledge of the facts out of which the forfeiture of the policy arose, neglected to declare its intention of insisting on the forfeiture, but, by its acts, recognized and treated the policy as a valid and subsisting contract between it and plaintiff, and induced him to act in that belief, it is precluded now from insisting on the forfeiture. This doctrine is excepted to by defendant. Its position is that to constitute a waiver of the provisions of the policy providing for the forfeiture the acts relied on must be attended with such equitable circumstances as would create an estoppel; and as plaintiff was not induced by the acts in question to in any manner change his position with reference to the subject of the negotiation, and as the acts were done after the forfeiture occurred, they do not create an estoppel. We think, however, that this position is not tenable. The principle on which the waiver of a forfeiture has been maintained in such cases is undoubtedly similar to that of estoppel. It was so held by this court in Viele v. Germania Ins. Co., 26 Iowa, 9, 96 Am. Dec. 83. But we think it is not true that such waiver can be created only by such acts or conduct as would create a technical estoppel. Neither forfeitures nor estoppels are favored by the law, and it follows necessarily from this consideration that the waiver of a forfeiture may be sustained by circumstances which do not present the strong equities which would be required to create an estoppel. When plaintiff asserted a claim under the policy for the loss, and defendant was informed of the facts out of which the forfeiture grew, it had the right at once to treat the contract as at an end. If it had elected simply to remain silent, perhaps a waiver could not have been inferred from its silence. But if, with the knowledge of the circumstances, it continued to treat the contract as of binding force, and induced plaintiff to act in that belief, the rule holding that it thereby waived the forfeiture is a very just one. We think, therefore, that the general doctrine of the instructions is correct, and it is well sustained by the authorities."

We quote as follows from Queen Insurance Co. v. Young, 86 Ala. 430, 5 South. 118, 11 Am. St. Rep. 51: "Conditions in a policy of insurance, limiting or avoiding liability, are strictly construed against the insurer, and liberally in favor of the assured. Though a

waiver may be in the nature of an estoppel, and maintained on similar principles, they are not convertible terms. The courts, not favoring forfeitures, are usually inclined to take hold of any ·circumstances which indicate an election to waive a forfeiture. A waiver may be created by acts, conduct, or declarations insufficient to create a technical estoppel. If the company, after knowledge of the breach, enters into negotiations or transactions with the assured, which recognize and treat the policy as still in force, or induces the assured to incur trouble or expense, it will be regarded as having waived the right to claim the forfeiture." In addition to the authorities cited in the opinion, this view is sustained by the following cases: Georgia Home Ins. Co. v. Moriarty, 37 S. W. 628, in which writ of error was refused by this court; Insurance Co. v. Norton, 96 U. S. 234, 24 L. Ed. 689; Oakes v. Insurance Co., 135 Mass. 249; Georgia Home Ins. Co. v. Kinnier's Adm'x, 69 Va. 88.

The motion for rehearing is overruled.

HAWKINS, J., not sitting.